JONES, JUDGE:
Early in May, 1967, the claimant, Jordon, McGettigan & Yule, a partnership, was employed by the respondent, Department of Mental Health, to perform architectural-engineering services for the construction of a Mental Retardation & Rehabilitation Center at Roneys Point in Ohio County. After a cpnference between the principals in Charleston, a letter was writtefi the‘respjpndenhto the claimant undér''dat^bf &¡TaJ^TÓ, 1007, confirming that a previously employed architect was unable to meet time requirements and had withdrawn from the project, expressing the respondent’s intent to enter into a contract with the claimant, and *65 •pointing out that a contract could not be processed until federal funds were encumbered, meaning that the respondent must have substantially complete working drawings and estimates of cost to meet a deadline set by Hill-Burton Authorities for the encumbrance of lapsing federal funds. The deadline was the week beginning June 19, 1967, allowing approximately 45 days for completion of the work. While it appears that the usual and customary fee for such services would have been 6 percent, it was agreed between the parties that due to the urgency of the project and the consequential extra overhead and overtime costs an 8 percent fee would be paid, and this was carried into the formal contract dated and executed on October 1, 1967, as “a fee of 8 per cent of the construction cost of the project.” The contract specifically provided that the claimant should not furnish cost estimates, in view of a federal requirement that two such estimates be given by local contractors. The contract further provided that payment for services at the completion of each phase of work should be divided as follows:
“Schematic Design Phase 15%
Design Development Phase 35%
Construction Documents Phase 75%
Receipt of Bids 80%
Construction Phase 100%”
A purchase order for this project dated May 23, 1968, constituting acceptance of the contract entered into by the parties and approved by the Attorney General and Department of Finance and Administration, recited the following:
“Estimated cost of construction $604,000.00
Fee based on 8 percent of construction cost $ 48,320.00”
The deadline was met by the claimant, two estimates were obtained from local contractors based on the claimant’s plans and specifications, both within $10,O00D0 of the $604,000.00 allocation for the project. While the federal requirements for the encumbering of funds had been met, the State Department of Health did not approve the drawings which showed sewage from the building to be connected to the nearest manhole. The change required the sewage to be connected with an abandoned sewage treatment plant, necessitating plans for renovating the plant and constructing a 1,500 foot access road, the cost of which was not eligible for federal participation. For no apparent reason, but *66 perhaps taking time to acquire additional funds, the project did not move from July, 1967, to June, 1968, when the claimant was authorized to prepare plans and specifications for rehabilitation of the sewage plant. The revisions were made and approved and the project was let to bids on March 3, 1970. The low bid was $861,000.00, two higher bids being in amounts of $884,724.00 and $1,389,930.84. The project was not let to contract as the low bid exceeded the available funds.
A meeting was held on April 10,1970, and the agreements arrived at were set out in a letter directed to the respondent by the claimant under date of April 13, 1970. Plans and specifications were to be revised for re-bidding, including the deletion of one wing of the building and other substantial changes, contemplating savings of approximately $200,000.00 to $250,000.00. The respondent’s letter further stated that it would keep accurate records and bill for the revisions “on the basis of 2.5 x Technical Payroll.” Contrary to the quoted language, the contract between the parties provided that for additional services the respondent would be paid “two (2) x the Direct Personnel Expense ***.” Shortly thereafter the respondent revised its previous billing to conform to 8 percent of the low bid of $861,000.00.
On May 15, 1970, the claimant was advised by the respondent that it should proceed with changes in the plans and specifications necessary to reduce the cost of the project of the amount of funds available. Under date of November 24,1970, the claimant billed the respondent in the amount of $13,959.20, based on 8 percent of the low bid, which was paid by the respondent, and in the same letter listed items to be included in the revised^ documents, including elimination of all sewage treatment plant work. By letter dated August 10, 1971, the respondent presented its bill for additional work in the total amount of $8,320.95, and replying under date of August 16, 1971, the Director of the respondent department informed the claimant that funds were not available to pay the invoice, reminded the claimant that the bid price was not acceptable because it exceeded the cost estimate of the project, and further stated that the respondent was attempting to obtain additional funds out of which the invoice would be paid. On November 15, 1972, the respondent informed the claimant that additional funds had been received. The respondent’s letter to claimant dated February 2, 1973, advised that the respondent planned to place the project out for bids as soon as possible and that further payments would be withheld until the construction *67 contract was awarded. From this point the project wound down in a hurry. Four letters, two of which apparently crossed in the mail, tell the story. The respondent wrote the claimant on February 20, 1973, that the project had been placed out for bids again since additional State money was available and the bid opening was set for March 21,1973. This letter further set out a rather extensive list of changes to be made in the plans and specifications. By letter dated February 26,1973, the claimant informed the respondent that its file and records pertaining to the project had been turned over to counsel for consideration and advice concerning the respondent’s failure to pay outstanding invoices and added that it would be impossible for any firm of architects-engineers to prepare the required contract documents in time for bids on March 21, 1973. A letter dated February 27, 1973, from the respondent to the claimant advised that the bid opening date had been changed to April 4, 1973, and another such letter dated March 1, 1973, advised the claimant that the requisition for the Roneys Point project had been cancelled. The project was thereupon abandoned and was never re-activated.
The respondent claims a balance due under the original contract, based on the low bid with 80 percent of the work completed, in the amount of $6,895.20. Two invoices for additional work in respective amounts of $1,425.75 and $2,541.00 were submitted to the respondent, making a total claim of $10,861.95. The respondent contends that under the original contract it only should be required to pay for services at the rate of 8 percent based on the estimated $604,000.00 cost of construction, 80 percent completed, which the Court calculates to be $38,656.00. The respondent has paid to the claimant $48,266.40, which would put the respondent in the rather awkward position of having overpaid the account in the sum of $10,610.40.
While the State may not be estopped from denying liability on the ground that an employee of the respondent has accepted and acted in accord with the claimant’s interpretation of the agreement, we think the statements and actions of the respondent throughout the period involved are indicative of the fact that there was a meeting of the minds and no major misunderstanding except of the Monday morning quarterback variety. The claimant presented plans and specifications t'o the respondent in June, 1967, which were satisfactory to the respondent, but a revision was necessary and promptly made to meet requirements of the Department of Health. For reasons that are not apparent but which we cannot *68 attribute to any fault on the part of the claimant, letting the project to bids was delayed until March 3,1970. The Court will take judicial notice of the inflationary conditions in our country during this period of delay. The inflationary situation also must have been obvious to the respondent and we doubt if anyone was much surprised that the low bid exceeded the estimates of the local contractors, made some 32 months before. As before stated the claimant’s fees were to be based on the construction cost of the project and that cost is further defined in the contract as the lowest acceptable bona fide contractor’s proposal received. In the circumstances, we deem the low bid of $861,000.00 to have been “acceptable” and we find no indication in the record that the bid would have been declined if sufficient funds had been available. The fee set out in the purchase ordered dated May 23,1968, was an estimate and nothing more. Considerable hope and some expectation of receiving additional funds appears from the record from the early days of the project to its dismal end. The failure of the project lies in a financial deficiency for which we cannot penalize the claimant.
Considering first the $6,895.20 claim under the original contract, we conclude that the claimant should be paid for the services represented by this charge, but with a limitation based on the Court’s right to invoke equity and good conscience. It appears that the 8 percent fee written into the employment contract would have been 6 percent except for the accelerated schedule required to meet the deadline for federal funds. It further appears that the decrease in cost from the time the claimant’s work was practically completed to the date of the bid letting was $257,900.00, substantially due to inflation, which a partner of the claimant’s firm described as spiraling upwards at the rate of lVz percent per month. To put it plainly, the Court feels it would be inequitable to allow the additional 2 percent fee on the inflated cost of the project, where the certain intention was that the additional fee was to be for additional work. Therefore, the Court will allow this portion of the fee based on 8 percent of $604,000.00 and 6 percent of $257,900.00, with the work 80 percent completed, or the sum of $51,035.20, of which $48,266.40 has been paid, leaving a balance of $2,768.80.
We further find that the contract in this ease provides for payment for additional services at a rate of 2 x the Direct Personhel Expense, which we cannot satisfactorily differentiate from Technical Payroll Expense, and accordingly the two invoices for *69 $1,425.75 and $2,541.00 are reduced by 20 percent to $1,040.60 and $2,032.80, respectively.
Upon consideration of the foregoing the Court is of opinion to and does hereby award to the claimant, Jordon, McGettigan & Yule, the sum of $5,942.20.
Judge Ducker participated in the hearing and decision of this case prior to his retirement from the Court.
Award of $5,942.20.